KETHLEDGE, J., delivered the opinion of the court, in which McKEAGUE, J., joined. KEITH, J. (pp. 743-56), delivered a separate dissenting opinion.
OPINION
KETHLEDGE, Circuit Judge.
At most the Constitution barely tolerates a public employer’s decision to hire or reject a job applicant based upon her race. Race-neutrality is the promise of the Equal Protection Clause; and the law permits a public employer to depart from that rule only reluctantly, in circumstances limited in both scope and duration. Namely, a public employer can hire or reject applicants based upon their race only to the extent, and only so long as, its use of racial classifications serves to remedy specific instances of past discrimination by that same employer. These limitations are long settled in the law. It is the affirmative duty and province of the courts to apply them.
Here, the district court found in 1975 that the City of Cleveland had discriminated against minorities in its hiring of entry-level firefighters. In 1977, the court approved a consent decree that included racial classifications as a remedy for that discrimination. The decision before us now is the court’s refusal, in 2009, to extend the life of the decree — and thus its racial classifications — for another six years. Although the court couched its decision in terms of whether the decree’s provisions remained “necessary,” the question more precisely stated is whether, 31 *739 years out, the decree’s racial classifications continue to remedy past discrimination by the City’s Fire Department. The district court did not make specific findings as to that question. It needs to make those findings before deciding whether to extend or terminate the decree. We vacate the court’s decision and remand for it to do so.
I.
Lamont Headen and several other African-American residents of Cleveland brought a class-action lawsuit against the City in 1973 after it rejected their applications to be firefighters. At that time, African-Americans comprised 40% of the City’s population but only four percent of its firefighters. After an evidentiary hearing, the district court found in 1975 that the City had unlawfully discriminated against minorities in hiring firefighters.
In 1977, the City and Headen submitted for court approval a consent decree that required the City to implement race-based criteria to remedy its past discrimination in firefighter hiring. Specifically, for each round of firefighter hiring that the City conducted, the decree required the City to hire at least the percentage of minorities who had passed the most recent entrance examination (the “Headen ratios”). The district court approved the consent decree. The decree was amended in 1984, but this provision remained essentially unchanged.
A more significant amendment came in 2000. In that year, the City moved to stay further execution of the decree, and a group called Cleveland Firefighters for Fair Hiring Practices (the “Cleveland Firefighters”) brought a lawsuit challenging the decree’s constitutionality. In response, the Vanguards of Cleveland — a minority-firefighter organization that by then had been made a party to the suit — defended the decree’s constitutionality and alleged that the City had continued to discriminate against minorities. The City denied the allegation.
The district court resolved these issues by entering a second amended consent decree in September 2000. That decree recited that the percentage of minority firefighters in the City’s fire department had increased to 26%. The decree established, for the first time, a goal of increasing that percentage to 33 1/3%. To that end, a related order changed the Headen ratios to require that at least one out of every three new hires be a minority applicant. The decree also required the City to conduct an additional three rounds of firefighter hiring (each from an “eligible list” of applicants who have passed the entrance exam) pursuant to the new Headen ratios. The decree required the City to conduct these additional hiring rounds by September 29, 2008, but stated that “[t]he parties understand that there may be legitimate circumstances which may prevent” the City from doing so. In that event, the decree provided, the City could petition the court for a “reasonable extension of time” to make those hires, which extension “shall be approved” if “the City has made a good faith effort to meet the September 29, 2008 deadline.”
A combination of events prevented the City from hiring any new firefighters after the second amended decree was entered. Most significantly, in 2003 the Ohio Police and Fire Pension fund established a new program — known as “DROP” — whose effect was to encourage retirement-eligible firefighters to continue working. As of June 2008, 211 Cleveland firefighters had enrolled in the program, which meant the City could make 211 fewer new hires, which as a practical matter meant it could make no new hires at all. Instead, as a result of a budget crisis, the City laid off 70 firefighters in 2004. To the extent the *740 City has hired any firefighters since then, it has only re-hired the laid-off ones.
The City recited these circumstances when it moved, on September 26, 2008, for an extension of the September 29, 2008 deadline. The Vanguards likewise moved on September 29 to “Extend the Terms of the Second Amended Consent Decree[.]” The Cleveland Firefighters opposed the decree’s extension on the grounds that the decree was no longer necessary and had already been in effect for more than 30 years. These motions landed on the docket of a new district court judge, the prior judge having passed away in 2006.
The district court held an evidentiary hearing with respect to the motions in May 2009. At the hearing’s end, the court requested briefing as to whether continued judicial supervision over the City’s hiring of firefighters remained necessary. The parties disregarded that request. Instead, they presented the court with a proposed third amended consent decree that would extend for six more years — to December 31, 2014 — the court’s supervision of the City’s firefighter hiring processes generally and the application of its racial classifications specifically. The court thereafter held a status conference at which it told the parties that a six-year extension of the decree was “unacceptable,” and invited them to make another proposal. The parties chose not to do so.
In an order dated August 29, 2009, the district court ruled on the motions to extend. The court cited the 2000 finding that “26% of the City’s firefighters were minorities,” which the court said was “a significant increase from the mere 4% that was cited by Plaintiffs at the outset of this case[.]” That increase, the court found, “constitutes substantial compliance with the arbitrary, aspirational goal of 33 1/3% minority representation in the Fire Department[.]” But the court’s main point was that the decree had already been in effect long enough. The court noted that the impact of its decision as to whether to extend the decree would “extend well beyond” the interests of the parties to this litigation, affecting future applicants for firefighter positions and city residents generally. The court also observed that the parties were asking it “to allow a Third Amended Consent Decree” whose term would stretch to “41 years since this case was filed in this Court.” And the court found that, “[b]y all accounts, the City has devised and implemented a plan for the recruitment of minority firefighter candidates,” and that “the City currently has in place a foundation that will lead to increased minority representation in the Fire Department once the economy allows for a more normal hiring process to resume.” Thus, the court concluded, “judicial monitoring” of the City’s hiring of firefighters “is no longer a necessity.” The court therefore denied the motions to extend the decree’s effective dates, and terminated the case.
This appeal followed.
II.
“We review a district court’s termination of supervision and jurisdiction over a consent decree for an abuse of discretion.” Gonzales v. Galvin, 151 F.3d 526, 531 (6th Cir.1998). “The appellant has the burden of proof on appeal to show that there was no reasonable basis for the district court’s termination order.” Id.
The appellants here — the plaintiffs de jure, and the City de facto — attempt to meet their burden primarily by arguing that the district court’s termination of the decree was contrary to the decree’s terms. Although the decree itself is opaque on the point, it appears to be common ground among the parties and the district court that, absent an extension, the decree would expire by its terms on September 29, 2008. *741 But the plaintiffs point to the second amended decree’s provision that it “shall be extended” if the City has not conducted another three rounds of firefighter hiring by that date and the City has otherwise tried to comply with the decree’s terms in good faith. Those prerequisites were undisputedly met here, so the plaintiffs argue that the district court’s refusal to extend the decree was contrary to its terms — and thus, the plaintiffs say, unlawful. That the parties had stipulated to the extension, the plaintiffs suggest, only compounded the court’s error. Thus, they contend, we should reverse the court’s order terminating the decree and ourselves order the district court to enter the proposed third amended decree.
These arguments assume that the district court’s role in administering a consent decree is essentially ministerial— that the court, for all time apparently, is bound to do whatever the decree says it must do. But a district court is not merely an instrument of a consent decree or of the parties’ stipulations with respect to it. The court instead has discretion with respect to whether and how a consent decree shall remain in effect, including the discretion to terminate the decree altogether. See Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 380, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992); Gonzales, 151 F.3d at 531. That discretion has limits, see Rufo, 502 U.S. at 383, 112 S.Ct. 748; but that a consent decree provides for its own extension does not necessarily mean that the district court must extend it. Nor does the fact that the parties have stipulated to an extension; for, as the district court correctly recognized, institutional decrees “affect more than the rights of the immediate litigants.” Heath v. DeCourcy, 888 F.2d 1105, 1109 (6th Cir.1989). The question, then, is whether the termination was lawful given not only the decree’s terms, but also the broader legal rules that govern consent decrees.
Some of those rules are set forth in Gonzales, which lays out procedural requirements that a district court must follow before terminating a consent decree. Among other things, a court should not “terminate jurisdiction over the consent decree without first making explicit findings concerning Defendants’ compliance with the decree’s goals and specific terms.” Gonzales, 151 F.3d at 532. With due respect, those requirements were not met here: to the extent the court made factual findings in its order terminating the decree, they were largely conclusory; and the court otherwise did not make findings regarding the City’s compliance with important aspects of the decree, such as whether the City had reevaluated its “entrance examination process.” See 2nd Amended Decree ¶ 8.
The Constitution supplies some other rules. Although the district court did not style its decision as constitutional, its analysis went to a question constitutional in origin: whether the court could lawfully extend the decree’s race-based measures to apply more than 37 years after they were first adopted. The district court was right to consider that question; and because (as discussed below) the court must consider it anew on remand, we lay out some principles governing that question here.
“[A]ll racial classifications must be reviewed under strict scrutiny[.]” Parents Involved in Community Schools v. Seattle School District No. 1, 551 U.S. 701, 741, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007). Racial classifications in consent decrees are subject to strict scrutiny just like any other. See Aiken v. City of Memphis, 37 F.3d 1155, 1162 (6th Cir.1994) (en banc). There are two racial classifications in the consent decrees here: first, the Headen ratios, which require that one of every three new firefighters hired by the City be *742 non-white; and second, the decree’s goal that 33 1/3% of the City’s firefighters, regardless of rank, be minorities. 2nd Amended Consent Decree ¶ 1. To survive strict scrutiny, each of these classifications must be narrowly tailored to achieve a compelling governmental interest. Parents Involved, 551 U.S. at 720, 127 S.Ct. 2738.
“[R]emedying the effects of past intentional discrimination” is a compelling interest. Id. Here, there was undisputedly past discrimination by the Fire Department, since the district court made such a finding back in 1975. To establish a compelling interest, however, the state actor must do more than prove past discrimination; it must show that the racial classification actually serves to remedy that discrimination. In the typical case, that showing is taken almost for granted; but the typical case does not involve a racial classification that the state actor has already applied for 31 years and proposes to apply for six more.
The district court was plainly mindful of that point at the close of the May 2009 evidentiary hearing. There, the district court requested that the parties brief the necessity of extending the consent decrees still further, stating that this issue “has to be addressed” and that “we didn’t hear anything about it today.” The parties disregarded that request, instead presenting the district court with what they presumably (but quite incorrectly, as it turned out) regarded as the fait accompli of a third amended consent decree. Before us, the parties now challenge the termination order on precisely the grounds that they refused to brief in the district court. Their conduct borders on grounds for waiver. We do not base our decision today on those grounds; but suffice it to say that the parties should have briefed the necessity of extending these classifications when the district court asked them to.
Whether a racial classification is supported by a compelling interest when first applied by a public employer, and whether it remains supported by such an interest 31 years later, are two different questions. And thus the core issue to be resolved in this litigation is whether, 31 years out, the decree’s racial classifications continue to remedy past discrimination by the Fire Department. The questions whether the decree’s goals have been met, and whether the parties have stipulated to extend its terms, are ultimately subordinate to that core issue. The Constitution trumps a consent decree. In a case involving racial classifications very similar to the ones here, the Eleventh Circuit observed: “After thirteen years of racial preferences ... the district court should consider the retrospective, remedial purpose of affirmative action satisfied except where it finds that past discrimination continues to taint a particular position.” Ensley Branch, N.AA. C.P. v. Seibels, 31 F.3d 1548, 1575-76 (11th Cir.1994). The same is true for racial classifications that have been in effect for 31 years.
To extend their effectiveness still longer, the district court must find that the classifications continue to remedy the Fire Department’s past discrimination in firefighter hiring. The district court expressed skepticism on this point — noting among other things that the classifications, if extended, would apply to applicants who had not even “been born at the time the case was filed.” But the court did not make a specific finding as to whether there is “strong evidence,” Aiken, 37 F.3d at 1163, that the decree’s racial classifications would remain remedial if extended beyond the time they have already applied. The court must make a careful finding on this point before deciding whether to extend or terminate the decree. Cf. Gonzales, 151 F.3d at 532. We will remand the case for the district court to do so.
*743 In this case, as in a previous one, we recognize that “racial discrimination and disadvantage exist[ ] at many levels of our society and in many ways.” Middleton v. City of Flint, 92 F.3d 396, 409 (6th Cir.1996). And our decision does not prevent the Vanguards from arguing — as they did in 2000 — that the decree’s racial classifications serve to remedy alleged discrimination by the Fire Department occurring after 1975. But the fact remains that the Supreme Court has laid down “particular standards as to when and to what extent race may be used by government as a factor to disadvantage some Americans at the expense of others.” Id. Those standards must be met here if the decree’s racial classifications are to apply longer than they already have.
The district court’s August 20, 2009 order is vacated, and the case remanded for further proceedings consistent with this opinion.